Good morning, your honors. May it please the court. My name is Stephen Robbins, pro bono counsel for the petitioner in this case, Mr. Luis Cayetano. I would like to reserve two minutes for rebuttal. No indication. The Board of Immigration Appeals dismissed Mr. Cayetano's application for asylum by finding there was no indication in the record that upon deportation he couldn't continue to receive the same types of community-based services, mental health services, that he received here in the United States. They also found that he was essentially a self-sufficient person who knew the names of his medications and could therefore self-medicate and live a normal life in Mexico. I want to tell you today about why that matters and why it's wrong. 2015 was not a good year for my client, Mr. Cayetano. He was diagnosed with schizophrenia, he was addicted to drugs, he was in legal troubles, and it was with the help of his family and his doctor and his behavioral health counselor and his drug rehabilitation that Mr. Cayetano was able to manage the symptoms of his schizophrenia. On one occasion, the voices in his head told him to leave the house and run, and the next thing he knew he was in Alfredo, Washington, a neighboring town where the police picked him up and returned him to his family. That said, 439 of the record, but the record reflects that he was working with his doctor, modifying his medications, and getting to the point where he could remain in the community. And by the time he was arrested by immigration in 2016, Mr. Cayetano was sober and clean for some four months. He was working with his father, and again, he had been able to remain a member of the community thanks to those services. Now, when the board says there's no indication that those services aren't available in Mexico, they simply couldn't be more wrong. The record is abundantly clear. This is not a record that lends itself to opposing but permissible views of the facts. Disability Rights International is an And they say at 488 that the primary reason for institutionalization, the primary reason in Mexico is the lack of community-based services. So say we agree with you that your client doesn't have the self-sufficiency skills needed to get treatment in Mexico, and maybe even that it's not that easy to get treatment in Mexico. How does that connect to he'll necessarily have a high enough chance of institutionalized and subjected to treatment that would count as persecution? Well, I think that we have to at least agree on that fact first before we can get to the the rest of the analysis. The judge and the board said that it's not even like that he's able to manage his symptoms. So if he's not, and if it is likely that he'll be institutionalized, then I think we're missing a connection there. Right. Well, what we do know is that the United Nations says that one of the problems with the the health care system and the mental health care system in Mexico is that the government doesn't keep statistics. So somehow we have a statistic at AR 537 that about 7,000 people are institutionalized for mental health reasons even though there are 15 million people in Mexico with mental illness. So I mean just those statistics, if we if that is what the board was relying on, then he can't get to 10% no Right. And that would be a really good statistic if the particular social group that we were putting forward was mentally ill people in Mexico. But that's not the particular social group. The particular social group has to do with family support and psychosis that is observable to the public. And I think that according to the reports in the record, these are the people who are most likely to be institutionalized. And can you point to any assessment of the numeric probability of that in the record? I mean how do we know even if they are the most likely if we're at like 0.001% how do we get to 10%? Well again I think that statistic is overly broad. It includes... No I hear you but do we have a statistic that helps you and where would it be in the record? Yeah I don't think again I think because there's a lack of record-keeping on this particular issue and also because you know frankly it would be comforting if all of these asylum cases could come down to a calculator and you know unfortunately that's not always possible especially when the government that is supposed to be protecting people like Mr. Cayetano don't keep track of their own abuses. And so we're left to wrestle with the facts right? And it seems he is certainly on the well-founded fear issue he's met the subjective prong quite well. The question then is this objective one and so I'm searching where in the record to you know where it would get pushed over not so that you might necessarily disagree with the BIA but it would actually compel the opposite conclusion. So what do you think would be the tipping point evidence here? Right well the reason why the board and the judge found that it was not objectively reasonable was because they say that community-based services are available in Mexico. There's no indication in the record that they're not according to the board and if somebody like Mr. Cayetano can go to Mexico and continue to receive the same types of treatment why would he be institutionalized? That's the argument that the board and the judge are putting forward. But the record over and over again states that those services are not available and so the record is clearly in opposition to the factual findings of the board. It's not just DRI the UN after three years of studying this issue in Mexico at 237 they noted concern for the lack of community health services in Mexico and our own State Department at 469 noted the same thing that there was a lack of programs for community integration and no changes in the mental health system to create community services. So say we agree with you about this, would we remand to the board to reassess the probability in light of the assumption that he actually doesn't have these independent skills and couldn't get this treatment in Mexico? I think that that's the the appropriate remedy especially in light of the recent case that came out last week where and again these are factual issues and every record is going to be different but a case that appears to be in JRGP it the opposite that it was likely that he would be institutionalized and so we have the board reaching contradictory conclusions and again the records may be different or the facts may be more specific but I think remand is necessary in this case because quite frankly the the factual basis of their finding that the fear was not objectively reasonable is simply at odds with the record. The services that Mr. Cayetano depends on to avoid institutionalization don't exist in Mexico. Is your client still detained here? He is and in fact he was he's been hospitalized and held an observation at the Northwest Detention Center and the respondent in their brief at page 29 in the footnote says well he was hospitalized but if he had access to his community-based care he probably wouldn't have needed to go to the hospital. So even the respondent is agreeing with us that it's the access to the community-based care that leads him to that allows him to avoid hospitalization or institutionalization. Do you want to save your remaining time? Yes I do, thank you. May it please the court, Sarah Bird on behalf of the respondent the Attorney General. The court should deny the petition for review because the evidence does not compel the conclusion that petitioner established his eligibility for asylum withholding of removal or protection under the Convention Against Torture. I'd like to start by piggybacking right off of what Petitioners Council said about that footnote in our brief. We pointed out that he went to the mental health unit in detention facility and pointed out that the fact that he stayed overnight was not the equivalent of institutionalization because he would be staying overnight in the detention facility whether it was in the dormitory or in the mental health unit and that actually he went to the mental health unit on his own reporting an increase in his symptoms and at the initial intake. So whether or not he's ever been institutionalized here seems a different issue so the assumptions that the agency seems to have made some of them anyway are that he had self-sufficiency skills and that this same kind of community health treatment was available in Mexico. Your opponent is saying neither of those things have any support in the record and I'm inclined to think that might be right so can you point to anything that supports these assumptions that the agency made? Yes, first the board when it says there's no indication that the outpatient treatment he was receiving here in the U.S. is unavailable I believe it's primarily referring to the medication not just to community support but to the psychotropic medication. Okay so the medication is there but if he doesn't have the self-sufficiency skills he's not gonna be able to get that medication right? So the record does not there is record support for the self-sufficiency skills he has come forward with his symptoms every single time that he's received medication or an increase in medication or a different kind of medication here in the United States. But he was having help from his parents always when he was not in custody correct? It's unclear, yes he lived with his parents. And didn't they bring him to his health appointments? He had a driver's license, he had his own car. Is there any evidence in the record that he could safely drive after the mental break that caused this mental illness? There's evidence in the record that he had a couple convictions for reckless driving because of the meth usage. It's unclear what he's capable of doing while on medication, psychotropic medication, but without meth because during the... So the answer is there's no support in the record for the idea that he has been able to drive since his mental illness? The answer is it's unclear and the answer here I would say is that it's his burden of proof to reasonable possibility of being institutionalized and there is... I mean I think that counsel acknowledged that that's the breakpoint issue and then everything flows from that. So he has some self-sufficiency and that he is able to, at least he has had an education, he has been able to drive in the past. We don't know what it would be like in the future. And then in terms of who ends up in the institutions, I think that's one of the biggest difficulties in this record. As you pointed out, the statistics are that a very small percentage of those with mental health concerns, which includes bipolar, borderline personality disorder, as well as schizophrenia, end up in the institutions. It's 0.017 percent or something to that effect. So it's a very small percentage, but then if you look at the DRI reports about who actually ends up there, the focus seems to be on children who are being institutionalized because their parents are unable to take care of them and the government in Mexico doesn't have a foster care system and they consider children with disabilities to be unadoptable. The DRI reports note in a footnote, and the immigration judge highlighted this, that of those people in institutions, and there's another statistic that I found in preparation for oral argument that's for the 2015 DRI report, there were 25,000 people living in institutions. Again, that's 0.17 percent of the 15 million, but that 25,000 includes people with physical disabilities, sensory disabilities, intellectual disabilities. And when the DRI reports are giving anecdotal information about who actually ends up in the institutions, it does seem to focus on children with physical disabilities whose parents can't take care of them. So if we think that there's a lack of substantial evidence to support the assumption that the agency made that he had the self-sufficiency skills needed to get treatment in Mexico, why wouldn't we need to remand to the agency to assess these probabilities without that assumption that wasn't supported in the record? The lack of self-sufficiency, even if he doesn't have the self-sufficiency to get all the treatment, it still doesn't show that he has an objectively reasonable likelihood of being institutionalized because there's actually- I mean, we might agree with you, but doesn't the agency need to make that determination? I mean, if we think there's a fatal flaw in the reasoning the agency made, or at least it may not be fatal, maybe there's other evidence, but from the evidence that you've pointed us to, I'm not persuaded that the idea that he once could drive means that now that he has mental illness he still can drive, especially when he's crashed, and I mean, there's a lot of evidence he can't drive anymore, so you haven't convinced me yet that there's evidence in the record that he has self-sufficiency skills, so if that, is that a, it seems to me that's, or at least arguably, that's one of the premises here. Additional evidence of self-sufficiency skills would be the letter from his employer talking about his work ethic and ability to work- But he's always worked with his father, right? It's not clear that he's actually, he's worked at the same, with the same employer as his father, yes. I don't know if they work on the same team, what is there? No? It's not clear to me that they always worked at the exact same shifts or the exact same time, and- Is there any evidence in the record that they worked separately? Well the, the letter from the employer doesn't mention his father at all, it mentions him as an employee, and doesn't say he came because his father brought him, doesn't say we hired him because we like his father, he is an adult man and he, as compared to the people that are described in the institutions, you know, the Interpress Service article describes people in one institution, the 300 people that can't walk and they're all in wheelchairs, he has self-sufficiency in that he is able to walk. They describe people who have never learned to read or write, people who have cerebral palsy and whose muscles have atrophied to the point that they're just bad ridden, and he, so when we're talking about self-sufficiency skills, we're talking about ability to walk, ability to see. So how do those things help him get medication though? I mean, just being able to walk isn't going to get him medication in Mexico. Well that could walk to a bus station to take a bus to go to the doctor, and he has testified about his medication, he's cognizant of what he takes, what he thinks he needs, even in detention, he was on one and he requested to switch to another, and he was able to talk about how he thought he needed an increase, and his parents weren't there with him, but he was, if you look at the records of his appointments with the mental health unit in the detention facility, he's the one that's coming forward and telling them what he thinks he needs, and that reflects, I'm not saying it'll be easy, this is not easy to move to another place that he hasn't been since he was 14. The immigration judge also found that his parents could continue to support him, at least by talking to them, being in relationship with him, they didn't, his only explanation for why they couldn't move to Mexico with him was that his mother had recently had an operation. One of the reasons... The BIA didn't assume that his parents would move with him though, right? The BIA cites the immigration judge's decision as to the reasons, and the immigration judge highlights that, but no, no one assumed that they would, they just point out that his parents, whether here in the United States, had some support, be that financial... Comment on the proposed social group? The BIA did not address the social group. The immigration judge found that it was not a cognizable social group, but that finding is not before this court because the board decided the case based on the lack of an objectively reasonable fear of future persecution. So if it went back, that would still be on the table? Right, the board would have to review the cognizability of the social group. Another point, let's see, I guess it's it's difficult, but it doesn't show that similarly situated people, the only similarly situated people that I found that was mentioned, someone with schizophrenia, who's an adult with schizophrenia in Mexico, was the and she is an advocate, you know, again, not easy, but she's receiving her psychotropic medication, she's able to advocate on behalf of the community, and the rest of the DRI reports simply don't talk about adults being institutionalized, and the 2013 Health Act says that they have to notify judicial authorities and go through various hoops. So he hasn't shown that it's objectively reasonable. Thank you. Thank you. You have some time for a rebuttal. Thank you. The Disability Rights International reports do deal with other types of people, including children, but to say that they deal mostly with children, I think, is a misrepresentation of those reports. Disability Rights International says people without families who are willing or able to support them are officially referred to as abandonados, and they are relegated to languish in institutions, without hope for return to the community. That clearly refers to people like my client. I want to talk about medication real quick. Mr. Cayetano has a 10th grade education. He's a farm worker. Knowing, this is almost too embarrassing to have to say out loud, but knowing the names of your drugs does not mean that you are a substitute for a mental health expert, a mental health counselor, or a doctor. Most people know the names of their drugs, and it's not just about access to drugs. Here, in this country, he's had access to drugs, and nevertheless, his symptoms have fluctuated. At times, he's gotten off his meds and needed to go back on, and so it's, and even in detention, he's had to change his medication, not on his own, because he's so smart, but with the help of his doctor. What does 10th grade education mean for him? He speaks limited English. He describes himself as not particularly intelligent, I think, in his declaration. My point is, did he just get passed along? What was his, his abilities? Right. Well, he describes dropping out of school to help support his parents when he was around that age, I think 15 or 16 years old, so, but even if he graduated from high school or had a GED or a bachelor's degree, that doesn't make him a doctor just because he knows the names of the drugs, and this is what the immigration judge did, and the board subsequently, you know, the judge said, well, there's pharmacies in Mexico, and he knows the names of his drugs, so he'll be fine, and the record simply doesn't support that, and so we do ask that this case... Could I just ask one other question? Yes. It looks like at one point, there was a status of that. I don't recall if that was addressed at trial or not. I can't answer that, I'm sorry. Thank you. All right, thank you. I'd like to thank both counsel for your argument. Cayetano-Hernandez v. Sessions is submitted. I'd also like to thank you, Mr. Robbins, for your pro bono service, and I know that both the court and the government appreciate having a The next case for argument is United States v. Chen.
judges: McKeown, Friedland, Gaitan